**LEONARDMEYER LLP**
Derek J. Meyer (CA Bar No. 278346)
1800 Century Park East, Suite 1400
Los Angeles, CA 90067
Tel: (310) 220-0331
rmeyer@leonardmeyerllp.com

*Attorneys for Plaintiff/Counter-Defendant WAYNE HIMELSEIN and Counter-Defendant LOGICA CAPITAL ADVISERS, LLC*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - (Western Division – Los Angeles)

| | |
|---|---|
| WAYNE HIMELSEIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>LS1 LLC, a Pennsylvania Limited Liability Company,<br><br>Defendant.<br><br>And related counterclaims. | CASE NO. 2:18 –cv-03940 GW (JCx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. George H. Wu<br>Courtroom: 9D |

   Plaintiff/Counter-Defendant Wayne Himelsein, by and through his undersigned attorneys, states as follows for his First Amended Complaint against Defendant/Counter-Plaintiff LS1 LLC:

**PARTIES**

   1.   Plaintiff Wayne Himelsein ("Himelsein") is a California citizen residing in Los Angeles County, California.

   2.   Defendant LS1 LLC ("LS1") is a Pennsylvania Limited Liability Company having an address of 300 Conshohocken Street Road, Suite 200, West Conshohocken, PA 19428.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

**A.     Background**

5. Himelsein is the manager of an investment firm known as Logica Capital Advisers ("LCA"). LCA launched the Logica Fund as a pooled investment fund for clients, and offers an investment option of a Separately Managed Account ("SMA") for clients. SMA clients have the ability to invest in Logica's strategies, but tailored to the client's preferences for investment style, time horizon, and risk profile.

6. Himelsein also manages the Logica Focus Fund through an investment firm known as Marketocracy Capital Management ("MCM"). Since September 2000, and under Himelsein's management, the Logica Focus Fund has had an average annual return of over 13%, as compared to an average annual return for the S&P 500 index of less than 6% over that same period. For the past three years, Himelsein's Logica Focus Fund outperformed all U.S. equity mutual fund managers, and Himelsein ranks in the top quartile of all U.S. Equity fund managers for the past 10, 5, and 1 year periods.

7. George Heckler ("Heckler") is an investor that began to hold discussions with Himelsein as early as in 2012 about possibly investing with Himelsein. Those discussions continued into the year 2013, with Heckler emphasizing a desire to enter into some sort of arrangement by which any capital he might invest, or direct for investment, for Himelsein to manage would have some form of a guarantee to cover some extent of potential trading losses.

8. As those discussions between Himelsein and Heckler progressed, Himelsein proposed that his ownership interest in a New York limited liability company called Himelsein Mandel Advisors, LLC ("HMA") be provided to Heckler as collateral, to protect against possible trading losses if Heckler invested capital for Himselsein to manage. To that end, HMA owned, among other assets, an interest in certain

anticipated future cash flows from the prior sale of a life insurance policy portfolio referred to as the Oaktree Receivable, which future cash flows could serve to provide the cushion that Heckler was seeking against possible trading losses. After learning more about the cash flows associated with HMA, Heckler countered, proposing that, rather than HMA being made collateral for possible trading losses, he liked the asset and preferred to buy HMA outright from Himelsein. Himelsein agreed.

9. Heckler wanted HMA to pledge as collateral to associated third parties seeking cushions against trading losses so that he could participate in larger profit sharing strategies he liked or was willing to backstop.

**B.  Certain Terms of the Purchase Agreement**

10. Heckler owns and controls LS1.

11. On December 30, 2013, Himelsein entered into a written agreement with LS1 to sell to LS1 his 100% membership interest in HMA pursuant to a Limited Liability Company Membership Interest Purchase Agreement (the "Purchase Agreement"). A true and correct copy of the Purchase Agreement is attached hereto as Exhibit A

12. Pursuant to Section 2.1 of the Purchase Agreement, Himelsein was to transfer to LS1 his entire 100% membership interest in HMA, in exchange for, among other things, LS1's agreement to pay to Himelsein the future value of $33,905,270 as of January 1, 2021, at an 18% Internal Rate of Return (the "Purchase Price").[1]

13. As a result, the effect of the financial terms was that the sooner LS1 paid Himelsein to decrease the balanced owed on the Purchase Price, the less the total dollar price.

14. Alternatively, the less LS1 paid Himelsein to decrease the balance owed on the Purchase Price, the greater the total dollar price.

15. That Purchase Price was, in turn, required to be paid by LS1 to Himelsein, as follows: (i) an up-front payment of $200,000 due at closing; (ii) thereafter, monthly installment payments in the amount of $200,000 (each a "Mandatory Installment Payment"); and (iii) certain so-called "Additional Purchase Price Payments" as defined in the Purchase Agreement. Pursuant to the Purchase Agreement,

---

[1] Expressly excluded from the sale were certain specified assets known as the (i) Fortress Litigation, and (ii) HMA Citibank bank account.

LS1's failure to pay any Mandatory Installment Payment would constitute a material breach. Under section 2.1.3 of the Purchase Agreement, LS1 could, at its option, make additional and discretionary purchase price payments at any time (any such payment a "Discretionary Purchase Price Payment").

16. The Purchase Agreement also provided that, at Himelsein's election, LS1, its designee, and/or its guarantors were required to provide collateral to secure LS1's obligations under the Purchase Agreement, and the security had to be sufficient and in the form required to the reasonable satisfaction of Himelsein.

17. Similarly, the Purchase Agreement provided that, at Himelsein's election, LS1, its designee, and/or its guarantors were required to provide Himelsein a guaranty to secure LS1's obligations under the Purchase Agreement.

18. In Section 4.2(b) of the Purchase Agreement, LS1 represented and warranted that "it has had full and complete access" to Himelsein, HMA's books and records and all other materials and information requested by LS1, and it was "afforded a reasonable opportunity to discuss and investigate all aspects of" HMA and its business with Himelsein.

19. Among other things, the Purchase Agreement also expressly recognized that LS1, prior to entering into the Purchase Agreement, had engaged an expert of LS1's own choosing "to conduct an extensive due diligence review and valuation" of what was being purchased. Specifically, Section 6.1 of the Purchase Agreement stated as follows:

> 6.1 *Due Diligence*. The Buyer acknowledges, represents and warrants to the Seller that buyer engaged an expert of Buyer's choosing to conduct an extensive due diligence review and valuation of the Membership Interest, the Oaktree receivable and the underlying portfolio of policies related to the Oaktree receivable, and following such satisfactory and successful due diligence review and valuation, Buyer has determined, of their sole volition, to enter into this Agreement. Buyer acknowledges, represents and warrants that neither Buyer nor their expert relied upon any representation or warranty, whether oral or in writing, from the Seller in arriving at their decision to enter into this Agreement, or for purposes of completing their due diligence review and valuation. Buyer further represents that as a result of Buyer's having completed such due diligence review and valuation, Seller shall have no ongoing or further obligation to provide Buyer or their expert with any additional documents or information for the purposes of further due diligence review and valuation of the Membership Interest, the Oaktree receivable, and the underlying portfolio of policies related to the Oaktree receivable.

20. LS1 also was provided with an extended due diligence period which provided LS1 with a right of rescission under the Purchase Agreement, whereby LS1 could rescind for "any reason" during the

one year period of time through December 31, 201 (the "Rescission Period"), providing LS1 with one full year to conduct further and extensive due diligence, as it saw fit.

### C. The Closing, and Initial Payments by LS1

21. The closing occurred on December 30, 2013. At that time, Himelsein delivered the executed assignment to LS1 of his 100% membership interest in HMA ("Assignment"). A true and correct copy of the Assignment is attached hereto as Exhibit B.

22. Although not paid upon closing as was required, within weeks of the closing, LS1 paid the required $200,000 up-front payment.

23. LS1 also delivered collateral in the form of the rights to certain liquid assets belonging to an entity in which Heckler had separately invested (the "Collateral Entity").

24. On February 4, 2014, LS1 paid $600,000, representing the first three months' installment payments (i.e., January – March of 2014) under the Purchase Agreement.

### D. LS1 Failed to Make Good on Its Payment and Security Obligations.

25. LS1 did not pay the Mandatory Installment Payments for April, May, or June 2014. Instead, Heckler informed Himelsein that he preferred for LS1 to pay only $100,000 per month, in two equal payments of $50,000 by the 1st and 15th of each month, instead of the required $200,000 per month. Himelsein agreed for the time being and until further notice (*i.e.*, the agreement was not open-ended), so that LS1 would not seek to exercise its rescission right.

26. Consistent with this adjustment, the parties treated the $600,000 received on February 4, 2014 therefore represented the first six months of adjusted installment payments (i.e., $100,000 per month, for January – June of 2014). Accordingly, the next installment payment was made by LS1 on July 17, 2014, in the amount of $50,000, and similar payments continued thereafter, in keeping with the prior adjustment to pay $100,000 per month (at $50,000 on each 1st and 15th). A full schedule of the installment payments made by LS1 is attached hereto as Exhibit C.

27. Importantly, although the installment obligation amounts were reduced for an undefined time, the total Purchase Price was unaffected, because it was still required to equal a total fixed value at a specified future date, per the mechanics of the Purchase Price. In other words, LS1's reduction in the amount of these initial monthly installment payments simply meant that LS1 would have to pay more

absolute dollars later in time in order to pay the remainder to equal the total Purchase Price of $33,905,270 by January 1, 2021.

28.     Also, within a year of the closing, the value of the collateral delivered to Himelsein upon closing was significantly reduced, because Heckler had caused the Collateral Entity to lose its principal asset of value.  Namely, the principal asset of the Collateral Entity was capital directed for investment by Heckler.  However, after pledging to Himelsein the capital of the Collateral Entity as security for the Purchase Agreement, Heckler withdrew from the Collateral Entity that same capital, and then redirected that capital toward paying the initial funding obligations under section 7.1 of the Purchase Agreement.  In other words, the money that Heckler used to pay LS1's initial funding obligations under section 7.1 of the Purchase Agreement came from the money that was supposed to serve as the security for the Purchase Agreement.  Thus, the Collateral Entity was made an empty shell by Heckler, and it no longer provided security for LS1's obligations under the Purchase Agreement.

29.     Himelsein reached out to Heckler to confirm that his security would be restored.  Heckler assured Himelsein that it would be.  Accordingly, Himelsein provided LS1 with a draft written security agreement to replace the prior collateral interest.  Notwithstanding LS1's obligations under the Purchase Agreement to provide sufficient security and a guaranty, LS1 did not sign the proposed new security and guaranty documents.

30.     Instead, months later, Heckler proposed instead to sign a letter directing a third party to send the future cash flows associated with HMA to Himelsein until Himelsein had been paid the Purchase Price.  Inasmuch as the Rescission Period had not yet expired, Himelsein accepted for the time being Heckler's proposal of a so-called direction letter; however, Himelsein still retained his rights under the Purchase Agreement to demand adequate security and/or guaranties at any time in the future.

**E.    LS1 Elected Not to Rescind.**

31.     LS1 continued to perform diligence on HMA throughout the Rescission Period with the continued assistance of its expert, Barrett Advisers, a prestigious and leading advisory firm in the industry that specialized in valuing certain assets owned by HMA.  In fact, LS1 selected Barrett Advisers over the reputable Deloitte Touche firm.

32. Throughout the diligence period, Himelsein provided to LS1, or its consultants, documentation and information when and as requested.

33. Having performed its evaluation and diligence, LS1 elected not to exercise its rescission right, and the Rescission Period expired on January 1, 2015.

**F.  After the Rescission Period expired, LS1 breached its funding obligations.**

34. At first, LS1 met certain initial investment funding obligations contemplated by the Purchase Agreement. By Summer of 2014, Heckler had directed investment of more than $20 million in with Himelsein.

35. Throughout the year 2015, Himelsein continued to meet and exceed the performance benchmarks required under the Purchase Agreement for Heckler/LS1 to have to continue directing investments in funds managed by Himelsein.

36. Heckler/LS1, however, did not continue directing investments and did not use best efforts to do so, notwithstanding the funding obligations under Section 7.1 of the Purchase Agreement. To the contrary, Heckler/LS1 directed the withdrawal of millions of dollars of invested capital throughout 2015.

37. In December 2015, Himelsein wrote to Heckler, questioning why millions of dollars of capital were being withdrawn, when Himelsein had met all the performance benchmarks that Himelsein had to meet in order for Heckler/LS1 to be obligated to use best efforts to make Minimum Additional Pipeline Installments. In response, Heckler/LS1 simply continued withdrawing invested capital, until all of the previously invested funds had been fully withdrawn.

**G.  After the withdrawal of all invested capital, LS1 stopped paying monthly Mandatory Installment Payments—not even at the adjusted level previously paid.**

38. In January 2017, LS1 failed to pay a Mandatory Installment Payment. LS1 did not even pay at the adjusted level of two $50,000 payments per month. In February and March 2017, LS1 paid $100,000 each month, but then it stopped paying installments again in April 2017.

39. After Himelsein had his legal counsel send a letter, LS1 paid $50,000 on July 18, 2017, and another $50,000 on August 1, 2017. But LS1 never made the second $50,000 payments for either July or August 2017. Nor did it catchup unpaid amounts for the previous months requested by Himelsein. And after the payment on August 1, LS1 did not pay anything again.

40. As shown on the schedule attached as Exhibit C, since the $50,000 payment on August 1, 2017, LS1 has not paid anything.

## COUNT I

### (Breach of Contract)

41. Himelsein repeats, realleges and incorporate the allegations of paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42. Himelsein and LS1 entered into the written Purchase Agreement.

43. Himelsein has performed any and all conditions precedent to this claim.

44. LS1 has breached the Purchase Agreement, by reason of LS1's failures to make Mandatory Installment Payments as shown in the attached schedule Exhibit C —even at an adjusted level of $50,000 twice a month. Specifically, as of the filing of this Complaint, LS1 has breached its installment payment obligations and failed to pay any installments at all for January 2017, April 2017, May 2017, June 2017, September 2017, October 2017, November 2017, December 2017, January 2018, February 2018, March 2018, April 2018, May 2018, June 2018, July 2018, August 2018 and September 2018.

45. As a direct and proximate result of LS1's breaches by failure to pay these installment payments, Himelsein has been damaged.

46. Further, by its words and conduct, LS1 has repudiated its obligations to perform under the Purchase Agreement. The entire Purchase Price is therefore owed Himelsein as damages. The amount of damages will be determined at trial based on the anticipated date of payment in full by LS1, and it will be in the eight figures.

47. For example, in addition to LS1 refusing to pay any portion of the seventeen monthly payments referenced in Paragraph 44 above, LS1 has filed numerous affirmative defenses and Counterclaims in this matter seeking, among other things, to pay no further amounts to Himelsein and rescind the Purchase Agreement, while alleging that Himelsein's performance of his obligations under the Purchase Agreement are not complete and that he has breached Section 8.10 of the Purchase Agreement.

48. Heckler, through his attorneys, also sent Himelsein a letter on August 14, 2018 on behalf of LS1 asserting that Himelsein's performance under the Purchase Agreement is not complete, citing Section 8.10 of the Purchase Agreement.

## COUNT II

### (For Declaratory Relief)

49. Himelsein repeats, realleges and incorporate the allegations of paragraphs 1 through 40 of this Complaint as though fully set forth herein.

50. As set forth above, Himelsein contends that LS1 is required under the Purchase Agreement to provide new and adequate security and guaranties for its obligations under the Purchase Agreement.

51. LS1 has failed to provide adequate security and guaranties upon Himelsein's demand being made in December 2017, and LS1 further failed to even respond to acknowledge its obligations to do so.

52. LS1 disputes its obligations to provide new and adequate security and guaranties under the Purchase Agreement, and that an actual controversy exists between the parties regarding whether and to what extent LS1 is required to provide adequate security and guaranties under the Purchase Agreement.

53. Himelsein requests a declaration that, pursuant to the Purchase Agreement, and to secure LS1's remaining obligations going forward under the Purchase Agreement, LS1 must deliver to Himelsein (i) a perfected first priority security interest in new and sufficient collateral pursuant to a security agreement, (ii) an irrevocable power of attorney, and (iii) a new and adequate guaranty or guaranties.

## COUNT III

### (For Restitution)

54. Himelsein repeats, realleges and incorporate the allegations of paragraphs 1 through 40 of this Complaint as though fully set forth herein.

55. On information and belief, LS1 and Heckler have used HMA as collateral in connections with investments where third parties seek cushions against trading losses and share trading profits for those who would provide adequate backing.

56. On information and belief, LS1 has pledged HMA as collateral in connections with certain transactions involving Prophecy Asset Management, L.P and/or its affiliated entities.

57. On information and belief, Heckler and/or entities controlled by Heckler act as sub-advisors for Prophecy Asset Management, L.P and/or its affiliated entities.

58. To the extent LS1 has earned fees or profit participation associated with pledging HMA as collateral, as between LSI and Himelsein it is unjust for LS1 to retain such benefits in light of its breach of its payment obligations under the Purchase Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Himelsein prays for relief as follows:

1. For compensatory damages according to proof at trial;
2. For restitution according to proof at trial;
3. For declaratory relief, as specified above;
4. For prejudgment interest; and
5. For such other and further relief this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Himelsein hereby demands trial by jury on this First Amended Complaint on all issues so triable.

Dated:  September 14, 2018                LEONARDMEYER LLP


                                          By: /s Derek J. Meyer
                                               Derek J. Meyer

                                          *Attorneys for Plaintiff Wayne Himelsein*