# EXHIBIT A

## LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT is made and entered into on December 30, 2013 (the "Agreement"), by and between LS1, LLC, a limited liability company organized and existing under the laws of the State of Pennsylvania having an address of 300 Conshohocken St. Rd., Suite 200, West Conshohocken, Pennsylvania 19428 ("Buyer") and Wayne Himelsein, an individual residing at 11847 Gorham Avenue, Apt. 404, Los Angeles, California 90049 ("Seller").

WHEREAS, Seller is the owner of 100% of the membership interests of Himelsein Mandel Advisers, LLC, a limited liability company organized and existing under the laws of the State of New York with a principal place of business located at 11726 San Vicente Boulevard, Suite 260, Los Angeles, California 90049 (the "Company"); and

WHEREAS, the Company owns and operates a business engaged in rendering investment advisory services (the "Business");

WHEREAS, Seller desires to sell his/her interest in the Company to Buyer, which represents 100% of the issued and outstanding membership interests of the Company (the "Membership Interest"); and

WHEREAS, Buyer desires to purchase the Membership Interest, in each case subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual premises and the covenants and promises contained, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, agree as follows:

Section 1. Sale of Membership Interest.

1.1. *Sale of Membership Interest.* On the terms and subject to the conditions set forth in this Agreement, Seller sells, transfers and delivers to Buyer, and Buyer purchases and accepts from Seller, the Membership Interest.

1.2. *Method of Transfer.* Upon payment of the Purchase Price described in Section 2.1, the sale, transfer, and delivery by Seller of the Membership Interest to Buyer shall be effected at the Closing by Seller's delivery of an assignment to Buyer evidencing the Membership Interest in a form the same as or substantially similar to the Form of Assignment attached hereto as Exhibit A. The delivery of such assignment shall vest in Buyer legal and beneficial ownership of the Membership Interest free and clear of any and all liens, pledges, encumbrances, claims, charges, security interests, rights of Seller and any third party, rights of redemption, equities, and any other restrictions or limitations of any kind or nature whatsoever (collectively, "Liens").

1.3. *Closing Date.* The closing of the transactions contemplated by this Agreement shall take place on or before December 30, 2013 (the "Closing") or, at such other date, time and place as may be agreed upon by the parties.

Section 2. Purchase Price.

2.1. *Purchase Price.* Upon execution of this Agreement, Seller shall sell, transfer and deliver to Buyer the Membership Interest in exchange for Buyer's agreement to pay Seller the future value of $33,905,270 as of January 1, 2021, at an eighteen percent (18%) Internal Rate of Return (the "Purchase Price"), as follows:

2.1.1. Mandatory Installment Payments. At Closing, and on the first of each month thereafter, the Buyer shall transfer to the Seller, as described in 2.2 below, the mandatory installment payments in the amount of $200,000 per month (each a "Mandatory Installment Payment"). Buyer shall be obligated to make Mandatory Installment Payments for the Term of this Agreement, or until the Seller has received the Final Purchase Price;

2.1.2. Additional Purchase Price Payments. Following Closing, the Buyer agrees that each dollar received by Buyer, its agent, or designee, including, but not limited to any amount received by Buyer and related to the Oaktree receivable or received by LMA I pursuant to the Investment Advisory Agreement between LMA I and Logica Diversified Capital Advisers, LLC (the "IAA"), its designee or successor in interest, shall be immediately paid to Seller, pursuant to Section 2.3 below, as an additional purchase price payment (each an "Additional Purchase Price Payment"); provided, however, with regard to LMA I, Buyer shall only be obligated to pay those amount Buyer receives which are, in excess of LMA I's Preferred Return (as defined in Section 2.1.3 below). Each Additional Purchase Price Payment and Discretionary

Purchase Price Payment shall reflect and include additional amounts such that the cumulative payment amounts when fully paid shall be equal to the Purchase Price less any Purchase Price Adjustments, as defined in Section 2.1.4 below (the "Final Purchase Price"); and

  2.1.3 *Buyer's Discretionary Purchase Price Payments.* The parties agree that Buyer shall have the right, but shall not be obligated, to make any additional and discretionary purchase price payment at any time during the term of this Agreement (each a "Discretionary Purchase Price Payment").

  2.1.3. *Preferred Return.* For purposes of this Section 2, Preferred Return shall mean LMA I's receipt of profits in LMA I equal to 15% per annum on cash (equity).

  2.1.4. *Purchase Price Adjustments.* For purposes of this Section 2, Purchase Price Adjustments shall mean the cumulative loss, if any, incurred by LMA I as of the date of the Final Purchase Price payment.

2.2. *Payment Terms.* The first Mandatory Installment Payment shall be payable by Buyer to Seller by wire transfer to the Seller's Account on or before January 15, 2014, and each subsequent Mandatory Installment Payment shall be due on the first of each month thereafter. The failure of the Buyer to tender the any Mandatory Installment Payment as proscribed in this Section 2.2, or any other payment required under the terms and conditions of this Agreement shall constitute a material breach of this Agreement.

2.3. *Payment Notice.* Prior to the payment of the Purchase Price, Seller shall be obligated to tender to Kinetic Partners Cayman Limited ("Kinetic"), the liquidator for Himelsein Mandel Offshore Limited ("HMO"), irrevocable instructions directing Kinetic to make future notices and payments pursuant to the direction letter, and such irrevocable instructions shall serve to immediately terminate Seller's authority with respect to the Company.

2.4. *Security Agreement; and Guaranty.*

  2.4.1. *Security Agreement.* At Seller's election, now or in the future, the Seller may require Buyer, its designee and/or guarantor(s) of Buyer, to provide collateral of Buyer, its designee and/or guarantor(s) of Buyer to secure Buyer's obligations under this Agreement (the "Collateral"). If so required by Seller, the Buyer, its designee and/or guarantor(s) of Buyer shall agree at all times to provide sufficient security in the form required to the reasonable satisfaction of the Seller, including, if required by the Seller, the following:

a) a perfected first priority security interest in the Collateral pursuant to a security agreement (the "Security Agreement"); and

b) an irrevocable power of attorney (the "Security Power of Attorney").

  2.4.2. *Further Assurances.* The Buyer and Coastal shall take all steps, and provide such assistance as the Seller may reasonably request, for the purpose of perfecting the Seller's security interest in the Collateral, including the making of any filings or notifications necessary or desirable in connection therewith, and by causing the Seller to have access, control and transparency with regard to and be added as a signatory to any and all bank accounts, trading account, clearing accounts or other accounts which are included in the Collateral (each a "Collateral Account"), such that no monies may be transferred out of a Collateral Account without the prior written authorization of Seller.

  2.4.3. *Obligations Unaffected by Insolvency.* All obligations of the Buyer and Coastal under this Agreement, including the Security Agreement and any other documents provided by way of security, are intended to survive the insolvency or liquidation of the Buyer.

  2.4.4. *Guaranty.* At Seller's election, now or in the future, the Seller may require Buyer, its designee and/or guarantor(s) of Buyer (each a "Guarantor"), to provide Seller a guaranty to secure Buyer's obligations under this Agreement (the "Guaranty"), as further consideration and inducement for Seller to enter into this Agreement, and in addition to any pledge of Collateral by Buyer, its designee and/or guarantor(s) of Buyer that may be required by Seller pursuant to Section 2.4.1 hereof, whereby Seller may pursue any one or all of the Guarantors for full payment of the Buyer's obligations hereunder.

**Section 3. Excluded Items.**

3.1. *Fortress Litigation.* The parties agree that the litigation entitled *Himelsein Mandel Fund Management, LLC v. Fortress Investment Group LLC*, Cal. Superior Court Docket No. BC495595, filed November 13, 2012 (the "Fortress Litigation")

HMA.MI.PSA.V123020133.2

shall be specifically excluded from the Buyer's purchase of the Membership Interests, and that any right, title, or interest in any amounts recovered as a result of the Fortress Litigation, or any amount to be paid to the Company which are derived from or related to the Fortress Litigation, shall be the exclusive and sole property of Seller. Buyer shall be obligated, following the execution of this Agreement, to provide irrevocable written direction to Kinetic, or its successor, if any, and HMO, to pay directly to Seller any such monies received by HMO which are derived by or from the Fortress Litigation, and which would otherwise be payable to the Company ("Fortress Cash Flows"). To the extent Buyer receives Fortress Cash Flows, Buyer shall (a) provide immediate notice of such receipt to Seller, (b) hold such monies received in constructive trust for Seller, and (c) transfer such monies to Seller within three (3) days of Buyer's receipt. For the avoidance of doubt, Buyer shall have no interest, right, or claim to receive any monies received by HMO and related to the Fortress Litigation, which would otherwise be payable to the Company.

3.2 *Himelsein Mandel Adviser's Citibank Bank Account.* The parties agree that the bank account in the name of Himlesein Mandel Advisers, LLC held at Citibank with account Number 95721547 shall be specifically excluded from the Buyer's purchase of the Membership Interests, and that any right, title, or interest in any amounts deposited therein shall be the exclusive and sole property of Seller ("HMA Bank Account"). Seller agrees to close the HMA Bank Account within a reasonable time following the execution of this Agreement.

Section 4. Representations and Warranties.

4.1. *Seller.* Seller represents and warrants to Buyer the following, all of which representations and warranties are true, complete, and correct in all material respects as of this date:

(a) *Organization and Qualification.* The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York. The Company has all requisite power and authority to own those properties and conduct those businesses presently owned or conducted by it. The Articles of Organization of the Company, the Operating Agreement of the Company, and all amendments thereto, which have been made available to Buyer, are complete and correct and are in full force and effect at this date.

(b) *Capital Structure.* Seller owns, and the Membership Interest constitutes, 100% of the outstanding membership interests of the Company. The Membership Interest is duly authorized, validly issued, fully paid, and non-assessable and the Seller holds all of the voting rights thereunder. There are no outstanding subscriptions, options, rights, warrants, convertible securities, or other rights, agreements and commitments obligating the Company or Seller to issue, sell or transfer any Membership Interest or any other interest in the Company.

(c) *Warranty of Title.* Seller holds good title to the Membership Interest free and clear of any and all Liens. Seller has full power and authority to transfer the Membership Interest as provided herein to Buyer without obtaining the consent or approval of any other person, corporation, association, partnership, limited liability company, joint venture, organization, business, individual, government or any agency or political subdivision thereof or any other entity (a "Person"). This Agreement is Seller's legal, valid and binding obligation, enforceable in accordance with its terms.

(d) *Authorization; No Restrictions, Consents or Approvals.* The execution and delivery of this Agreement, the sale of the Membership Interest and the consummation by Seller of the transactions contemplated herein, do not (i) conflict with or violate any of the terms of the Articles of Organization of the Company, the Operating Agreement, or any applicable Law, (ii) conflict with, or result in a breach of any of the terms of, or result in the acceleration of any indebtedness or obligations under, any agreement, obligation or instrument by which the Company is bound or to which any property of the Company is subject, or constitute a default thereunder, (iii) result in the creation or imposition of any Lien on the Membership Interest or the assets of the Company, or (iv) conflict with, or result in or constitute a default under or breach or violation of or grounds for termination of, any license, permit or other governmental authorization to which Seller or the Company is a party or by which Seller or the Company may be bound, or result in the violation by Seller or the Company of any Laws to which Seller or the Company or any assets of the Company may be subject. No authorization, consent or approval of, notice to, or filing with, any public body or governmental authority or any other Person is necessary in connection with the execution and delivery by Seller of this Agreement or the performance by Seller of its obligations hereunder.

(e) *Taxes.* The Company has timely filed (timely being understood to include all properly granted extensions) all returns required to be filed by it with respect to all federal, state, local and foreign income, payroll, employment, unemployment, withholding, excise, sales, personal property, use, business and occupation, franchise and occupancy, real estate, or other taxes (all of the foregoing taxes including interest and penalties and estimated taxes, subsequently referred to as the "Taxes"), has paid all Taxes which are shown to have become due pursuant to such returns, and has paid all other Taxes for which it has received a notice of assessment or demand for payment or has otherwise been made aware of a deficiency. All such

returns or reports are true and correct in all material respects.

(f) *Contracts and Other Documents.* Neither the Company nor any other party is in material default under any contract or other instrument to which the Company is a party or by which it is bound.

(g) *Accounts Receivable.* All of the Company's accounts receivable arose from bona fide transactions in the ordinary course of business of the Company.

4.2. *Buyer.*

(a) Buyer represents and warrants to Seller that: (i) it has authority to enter into this Agreement and to consummate the transactions contemplated hereby; (ii) entry into this Agreement and consummation of the transactions contemplated hereby will not violate or cause a default under any other agreement, instrument, arrangement, order, writ, judgment or the like to which Buyer and/or any of its assets or properties are bound; and (iii) the execution and delivery of this Agreement is Buyer's legal, valid and binding obligation, enforceable in accordance with its terms.

(b) Buyer represents and warrants that it has had full and complete access to the Seller and to the Company's books, records, and all other material and information requested by it, and has been afforded a reasonable opportunity to discuss and investigate all aspects of the Company and the Business with the Seller.

**Section 5. Survival of Representations and Warranties.**

5.1. *Survival of Representations and Warranties and Covenants.* The representations, warranties, covenants, and obligations of Buyer and Seller set forth in this Agreement and in any certificate, agreement, or instrument delivered in connection with the transactions contemplated hereby shall survive the Closing; provided that all representations, warranties and/or covenants set forth in Section 4.1 shall terminate on that date that is eighteen (18) months following the date of the Closing.

**Section 6. Due Diligence; and Buyer's Right of Rescission.**

6.1. *Due Diligence.* The Buyer acknowledges, represents and warrants to Seller that Buyer engaged an expert of Buyer's choosing to conduct an extensive due diligence review and valuation of the Membership Interest, the Oaktree receivable, and the underlying portfolio of policies related to the Oaktree receivable, and following such satisfactory and successful due diligence review and valuation, Buyer has determined, of their sole volition, to enter into this Agreement. Buyer acknowledges, represents and warrants that neither Buyer nor their expert relied upon any representation or warranty, whether oral or in writing, from the Seller in arriving at their decision to enter into this Agreement, or for purposes of completing their due diligence review and valuation. Buyer further represents that as a result of Buyer's having completed such due diligence review and valuation, Seller shall have no ongoing or further obligation to provide Buyer or their expert with any additional documents or information for the purposes of further due diligence review and valuation of the Membership Interest, the Oaktree receivable, and the underlying portfolio of policies related to the Oaktree receivable.

6.2. *Buyer's Right of Rescission.* Following the Closing, the Buyer may rescind this Agreement for any reason during the Buyer Rescission Period (as defined in this Section 6.2); provided, however, the parties mutually agree to modify this provision and provide for additional rescission rights for Buyer at anytime hereafter provided that such modification is in writing and signed by each party to this Agreement. For purposes of this Section 6.2, the buyer's rescission period shall mean that period commencing at 12:01 am EST on December 1, 2014 and ending at 11:59 am EST on December 31, 2014 ("Buyer Rescission Period"). If Buyer elects to rescind this Agreement, the Buyer must tender written notice of such rescission to Seller prior to the expiration of the Buyer Rescission Period in accordance with the Notice Provisions set forth in Section 7.8 below. In the event that the Buyer rescinds this Agreement, within five (5) days of delivering such notice the Buyer shall transfer the Membership Interests back to the Seller less the Retained Membership Interest by way of assignment. Retained Membership Interest shall mean a pro rata portion of the Membership Interests equal to all Additional Purchase Price Payments received by Seller, *plus* any Discretionary Purchase Price Payments received by Seller, *plus* all Mandatory Installment Payments received by Seller, *plus* the loss, if any, then existing with regard to the LMA I investment account, and *minus* any other adjustments agreed upon by the Buyer and Seller at the time of the rescission. Notice from Buyer of rescission after the expiration of the Buyer Rescission Period shall be ineffective and unenforceable, unless otherwise agreed to in writing by Seller. In the event that Buyer rescinds the transaction prior to the Buyer Rescission Period, then the Retained Membership Interest that the Buyer would otherwise receive pursuant to this Section 6.2 shall not include losses, if any, that are then existing with regard to the LMA I investment account.

6.3. *Right to Rescind Resulting from Death.* Prior to the expiration of one (1) year from the date of this Agreement ("Rescission Period for Death"), the Buyer or Seller may, at the non-decedents election, rescind this Agreement upon the

death of either Wayne Himelsein or George Heckler. If Buyer elects to rescind this Agreement pursuant to this Section 6.3, the Buyer must tender written notice of such rescission to Seller's heirs or legal representatives prior to the expiration of the Rescission Period for Death in accordance with the Notice Provisions set forth in Section 7.8 below. In the event that the Buyer rescinds this Agreement, within five (5) days of delivering such notice the Buyer shall transfer the Membership Interests back to the Seller's heirs or legal representative by way of assignment less the Retained Membership Interest. If Seller elects to rescind this Agreement pursuant to this Section 6.3, the Seller must tender written notice of such rescission to Buyer prior to the expiration of the Rescission Period for Death in accordance with the Notice Provisions set forth in Section 7.8 below. In the event that the Seller rescinds this Agreement, within five (5) days of delivering such notice the Buyer shall transfer the Membership Interests by way of assignment back to the Seller less the Retained Membership Interest. Notice from Buyer or Seller of rescission after the expiration of the Rescission Period for Death shall be ineffective and unenforceable.

Section 7. Investment Account Funding; and Funding Breach.

7.1. *Investment Account Funding.* Upon execution of this Agreement, Buyer hereby commits and agrees to make additional capital contributions to the LMA I investment account. The first such capital contribution shall be in the amount of $3,000,000 and occur not later than January 15, 2014 ("First Capital Installment"). Thereafter, The Buyer is hereby committed, on a best efforts basis, to make minimum additional contributions to LMA I as requested by Seller to adequately and successfully fund and onboard all traders/sub-advisors that are currently, or are later added to, the pipeline. The parties anticipate, but may later mutually agree otherwise in writing, that such minimum additional pipeline contributions shall be (a) made monthly, and (b) be in an amount not less than is reasonably requested by Seller to maintain and substantially grow an optimum portfolio of traders/sub-advisors in LMA I (each a "Minimum Additional Pipeline Contribution"); provided, however, Buyer shall be obligated to make each Minimum Additional Pipeline Contribution only if LMA I's performance as of such quarter is within 300 bps of the average of the representative indices set forth on Exhibit B hereto.

7.2. *Funding Breach.* In addition to any other unspecified breach by Buyer with respect to this Agreement, to the extent that Buyer fails to either (a) make the First Capital Installment, or (b) make each required Minimum Additional Pipeline Contribution during the term of this Agreement, then Buyer shall be deemed to be in breach of Buyer's obligations under this Section 7, and shall within three (3) days deliver, as liquidated damages to the Seller, the Collateral or the 100% of the Membership Interests, *minus* only the total of all Mandatory Installment Payments made by Buyer as of such breach; provided, however, if Buyer tenders the Membership Interests to Seller as payment of the Liquidated Damages as described in the immediately preceding sentence, then Buyer shall retain a pro rata portion of the Membership Interests equal to the total amount of all Mandatory Installment Payments made by Buyer prior to such breach. Buyer understands, acknowledges and agrees that the Seller is relying upon this provision, and the Liquidated Damages described herein, as additional consideration for entering into this Agreement. Buyer further understands, acknowledges and agrees that Buyer shall not have any right or claim of offset from the Liquidated Damages for amounts otherwise paid hereunder by Buyer to Seller. The Liquidated Damages shall not serve to limit in any way other damages that Seller may be able to prove or recover at trial, or which a court of competent jurisdiction deems appropriate to award.

Section 8. General Provisions.

8.1. *No Third Party Beneficiaries.* Nothing in this Agreement is intended, nor shall it be construed, to confer any rights or benefits upon any Person (including, but not limited to, any employee or former employee of the Company) other than the parties, and no other Person shall have any rights or remedies under this agreement.

8.2. *Expenses of the Parties.* Each party shall be responsible for their own expenses incurred in connection with the preparation, authorization, and consummation of this Agreement and the transactions contemplated hereby including, without limitation, all reasonable fees and expenses of agents, representatives, counsel, and accountants in connection therewith.

8.3. *Amendment and Waiver.* This Agreement may not be changed or terminated orally, but only by a written instrument executed by all of the parties. No waiver of compliance with any provision or condition, and no consent provided for, shall be effective unless evidenced by an instrument in writing duly executed by all of the parties.

8.4. *Headings; Counterparts.* The Section headings of this Agreement are for convenience of reference only and do not form a part of this agreement and do not in any way modify, interpret, or construe the intentions of the parties. This Agreement may be executed in one or more counterparts and all such counterparts shall constitute one and the same instrument.

8.5. *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the conflict of laws principles of that state. The parties consent to the jurisdiction of the

courts of the State of California, in Los Angeles County, and the United States District Court for the Central District of California.

8.6. *Binding Effect.* This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, administrators, legal representatives, successors and permitted assigns.

7.7. *Complete Agreement.* This Agreement and the Schedules and other documents referred to or executed in connection with this agreement contain the entire agreement between the parties with respect to the transactions contemplated and supersede all previous negotiations, commitments, and writings.

8.8. *Notices.* Any notice, report, demand, waiver, consent or other communication given by a party under this Agreement (each a "notice") shall be in writing, may be given by a party or its legal counsel, and shall be deemed to be duly given (i) when personally delivered, or (ii) upon delivery by United States Express Mail or similar overnight courier service which provides evidence of delivery, or (iii) when ten (10) days have elapsed after its transmittal by registered or certified mail, postage prepaid, return receipt requested, addressed to the party to whom directed at that party's address as it appears at the beginning of this Agreement or another address of which that party has given notice, or (iv) when delivered by facsimile transmission if a copy thereof is also delivered in person or by overnight courier. Notices of address change shall be effective only upon receipt notwithstanding the provisions of the foregoing sentence.

8.9. *Assignment.* Except as expressly provided, this Agreement and any rights and/or obligations pursuant to it shall not be assignable by Buyer without the prior written consent of Seller which may be given, withheld or delayed in the sole discretion of Seller. Except as provided in the previous sentence, this Agreement and all of the rights and obligations under it shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.

8.10. *Further Assurances.* Each of the parties will cooperate with the other and execute and deliver to the other parties such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other party as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

8.11. *Severability.* If any term or provision of this Agreement shall be held to be invalid or unenforceable for any reason, that term or provision shall be ineffective to the extent of such invalidity or unenforceability without invalidating the remaining terms and provisions, and this Agreement shall be construed as if such invalid or unenforceable term or provisions had not been included.

8.12. *Mutual Drafting.* This Agreement is the result of the joint efforts of the Buyer and the Seller, and each provision has been subject to the mutual consultation, negotiation and agreement of the parties and there shall be no construction against any party based on any presumption of that party's involvement in the drafting of this agreement.

*[signature page follows immediately]*

*[remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Membership Interest Purchase Agreement as of the date first above written.

SELLER:

_(Signature)_

By: Individually

Print Name: Wayne Himelsein

Date: Dec 30, 2013

BUYER:

_(Signature)_

By: LS1, LLC

Print Name: George Heckler

Its: Managing Member

Date: _____

HMA.MLPSA.V12302013.2

Page 7 of 10

IN WITNESS WHEREOF, the parties have executed this Membership Interest Purchase Agreement as of the date first above written.

SELLER:

_____
*(Signature)*

By: Individually

Print Name: Wayne Himelsein

Date: _____

BUYER:

*[signature]*
_____
*(Signature)*

By: LSI, LLC

Print Name: George Heckler

Its: Managing Member

Date: 12/31/13

### Exhibit A

### FORM OF ASSIGNMENT

### ASSIGNMENT AGREEMENT

This assignment agreement ("Agreement") is made December ___, 2013, by Wayne Himelsein ("Assignor"), as an individual, and resident of the State of California, and LS1, LLC ("Assignee"), a limited liability company organized and existing under the laws of the State of Pennsylvania.

1. As of the date of this Agreement, Assignor owns (100%) of the outstanding membership interests ("Assignor's HMA Membership Interest") in Himelsein Mandel Advisors, LLC (the "Company" or "HMA").

2. For value received by Assignor, the sufficiency and adequacy of which is hereby confirmed, Assignor forever and completely transfers to the Assignee one-hundred percent (100%) of Assignor's HMA Membership Interests in HMA, hereinafter to be held and titled in the name of Assignee.

3. The Assignee hereby accepts the assignment and transfer of the Assignor's Membership Interest described in Paragraph 2 above.

4. The Company hereby consents to the assignment and transfer of the Assignor's Membership Interest by Assignor to Assignee and the Company hereby confirms that Company shall immediately reflect the transfer of such membership interests described in Paragraph 2 on its records, and title such membership interests in the name of Assignee.

5. For the avoidance of doubt, following the execution and delivery of this Agreement, Assignee shall own one-hundred percent (100%) of the outstanding membership interest in the Company.

6. The parties agree that the Company's right, title or interest in the litigation entitled *Himelsein Mandel Fund Management, LLC v. Fortress Investment Group LLC*, Cal. Superior Court Docket No. BC495595, filed November 13, 2012 (the "Fortress Litigation") shall be specifically excluded from the Buyer's purchase of the Membership Interests, and that any right, title, or interest in any amounts recovered as a result of the Fortress Litigation, or any amount to be paid to the Company which are derived from or related to the Fortress Litigation, shall be the exclusive and sole property of Assignor.

*[signature page follows immediately]*

*[the remainder of this page intentionally left blank]*

In witness whereof, the parties have executed this Agreement as of the day and year first written above.

**ASSIGNOR:**

WAYNE HIMELSIEN

By: _____
      Wayne Himelsein

Date: _____

**ASSIGNEE:**

LS1, LLC

By: _____
      George Heckler
Its:    Managing Member

Date: _____

**COMPANY:**

HIMELSEIN MANDEL ADVISORS, LLC

By: _____
      Wayne Himelsein, solely in his capacity as Managing Member
      of Himelsein Mandel Advisors, LLC

Date: _____

## Exhibit B

### INDICES

| Name of Index |
|---|
| Barclay FoF Index |
| Credit Suisse AllHedge Index |
| Credit Suisse AllHedge L/S Equity Index |
| Eurekahedge Global Multi-Strat FoF Index |
| Lyxor HF Index |

# EXHIBIT B

## ASSIGNMENT AGREEMENT

This assignment agreement ("Agreement") is made December 30, 2013, by Wayne Himelsein ("Assignor"), as an individual, and resident of the State of California, and LS1, LLC ("Assignee"), a limited liability company organized and existing under the laws of the State of Pennsylvania.

1. As of the date of this Agreement, Assignor owns (100%) of the outstanding membership interests ("Assignor's HMA Membership Interest") in Himelsein Mandel Advisors, LLC (the "Company" or "HMA").

2. For value received by Assignor, the sufficiency and adequacy of which is hereby confirmed, Assignor forever and completely transfers to the Assignee one-hundred percent (100%) of Assignor's HMA Membership Interests in HMA, hereinafter to be held and titled in the name of Assignee.

3. The Assignee hereby accepts the assignment and transfer of the Assignor's Membership Interest described in Paragraph 2 above.

4. The Company hereby consents to the assignment and transfer of the Assignor's Membership Interest by Assignor to Assignee and the Company hereby confirms that Company shall immediately reflect the transfer of such membership interests described in Paragraph 2 on its records, and title such membership interests in the name of Assignee.

5. For the avoidance of doubt, following the execution and delivery of this Agreement, Assignee shall own one-hundred percent (100%) of the outstanding membership interest in the Company.

*[signature page follows immediately]*

*[the remainder of this page intentionally left blank]*

WH.LS1.Assignment.Agreement.v12302013.1

In witness whereof, the parties have executed this Agreement as of the day and year first written above.

**ASSIGNOR:**

WAYNE HIMELSEIN

By: _____
         Wayne Himelsein

Date: Dec 30, 2013

**ASSIGNEE:**

LS1, LLC

By: _____
         George Heckler

Its:    Managing Member

Date: _____

**COMPANY:**

HIMELSEIN MANDEL ADVISORS, LLC

By: _____
         Wayne Himelsein, solely in his capacity as Managing
         Member of Himelsein Mandel Advisors, LLC

Date: Dec 30, 2013

In witness whereof, the parties have executed this Agreement as of the day and year first written above.

**ASSIGNOR:**

WAYNE HIMELSIEN

By: _____
       Wayne Himelsein

Date: _____

**ASSIGNEE:**

LS1, LLC

By: *[signature]*
       George Heckler

Its:   Managing Member

Date: 12/31/13

**COMPANY:**

HIMELSEIN MANDEL ADVISORS, LLC

By: _____
       Wayne Himelsein, solely in his capacity as Managing Member of Himelsein Mandel Advisors, LLC

Date: _____

# EXHIBIT C

| Purchase Price (per contract) | | | first payment in FEB 2014 | | |
|---|---|---|---|---|---|
| IRR | 18% | | Start Date | 12/31/13 | |
| FV of 1/1/21 | $ 33,905,270 | | Final Pay Date | 1/1/2021 | |
| | | | Date | 3/15/2018 | |
| | | | Periods Remaining | 2.84 | |
| LS 1 Payments | $ 3,900,000 | | | | |
| | | | Balance Left | Time Left (yrs) | |
| Date | Amount | PV: | ($10,459,372.03) | 7.11 | |
| 2/4/2014 | $ 600,000.00 | | ($10,029,042.40) | 7.01 | |
| 7/17/2014 | $ 50,000.00 | | ($10,759,510.87) | 6.56 | |
| 8/1/2014 | $ 50,000.00 | | ($10,783,969.59) | 6.51 | |
| 8/18/2014 | $ 50,000.00 | | ($10,818,586.92) | 6.47 | |
| 8/29/2014 | $ 50,000.00 | | ($10,823,439.27) | 6.44 | |
| 9/12/2014 | $ 50,000.00 | | ($10,843,330.90) | 6.40 | |
| 9/30/2014 | $ 50,000.00 | | ($10,883,439.63) | 6.35 | |
| 10/14/2014 | $ 50,000.00 | | ($10,903,718.71) | 6.31 | |
| 10/30/2014 | $ 100,000.00 | | ($10,884,224.36) | 6.26 | |
| 11/14/2014 | $ 50,000.00 | | ($10,909,546.13) | 6.22 | |
| 12/2/2014 | $ 50,000.00 | | ($10,950,205.12) | 6.17 | |
| 12/16/2014 | $ 50,000.00 | | ($10,970,915.33) | 6.13 | |
| 1/2/2015 | $ 50,000.00 | | ($11,006,999.54) | 6.09 | |
| 1/15/2015 | $ 50,000.00 | | ($11,022,984.38) | 6.05 | |
| 2/2/2015 | $ 50,000.00 | | ($11,064,586.05) | 6.00 | |
| 2/17/2015 | $ 50,000.00 | | ($11,091,155.97) | 5.96 | |
| 3/2/2015 | $ 50,000.00 | | ($11,107,645.32) | 5.92 | |
| 3/16/2015 | $ 50,000.00 | | ($11,129,372.19) | 5.88 | |
| 4/1/2015 | $ 50,000.00 | | ($11,161,543.91) | 5.84 | |
| 4/16/2015 | $ 50,000.00 | | ($11,188,784.81) | 5.80 | |
| 5/4/2015 | $ 50,000.00 | | ($11,231,764.29) | 5.75 | |
| 5/18/2015 | $ 50,000.00 | | ($11,254,292.65) | 5.71 | |
| 6/1/2015 | $ 50,000.00 | | ($11,276,966.48) | 5.67 | |
| 6/22/2015 | $ 50,000.00 | | ($11,336,373.01) | 5.61 | |
| 7/6/2015 | $ 50,000.00 | | ($11,359,576.87) | 5.57 | |
| 7/15/2015 | $ 50,000.00 | | ($11,356,678.60) | 5.55 | |
| 8/3/2015 | $ 50,000.00 | | ($11,406,319.26) | 5.49 | |
| 8/17/2015 | $ 50,000.00 | | ($11,429,974.80) | 5.46 | |
| 9/2/2015 | $ 50,000.00 | | ($11,464,365.97) | 5.41 | |
| 9/17/2015 | $ 50,000.00 | | ($11,493,702.47) | 5.37 | |
| 10/5/2015 | $ 50,000.00 | | ($11,539,215.84) | 5.32 | |
| 10/19/2015 | $ 50,000.00 | | ($11,563,729.54) | 5.28 | |
| 11/5/2015 | $ 50,000.00 | | ($11,604,465.32) | 5.23 | |
| 11/18/2015 | $ 50,000.00 | | ($11,624,031.86) | 5.20 | |
| 12/8/2015 | $ 50,000.00 | | ($11,681,410.62) | 5.14 | |
| 12/29/2015 | $ 50,000.00 | | ($11,744,740.97) | 5.08 | |
| 1/12/2016 | $ 50,000.00 | | ($11,770,581.84) | 5.04 | |
| 2/1/2016 | $ 50,000.00 | | ($11,829,314.39) | 4.99 | |
| 2/18/2016 | $ 50,000.00 | | ($11,872,134.10) | 4.94 | |

| Date | Amount | Month | Balance | Rate |
|---|---|---|---|---|
| 3/1/2016 | $ 50,000.00 | | ($11,887,815.44) | 4.91 |
| 3/15/2016 | $ 100,000.00 | | ($11,864,580.21) | 4.87 |
| 4/1/2016 | $ 50,000.00 | | ($11,907,676.63) | 4.82 |
| 4/18/2016 | $ 50,000.00 | | ($11,951,111.21) | 4.78 |
| 5/11/2016 | $ 50,000.00 | | ($12,028,159.19) | 4.71 |
| 5/17/2016 | $ 50,000.00 | | ($12,011,385.57) | 4.69 |
| 6/1/2016 | $ 50,000.00 | | ($12,044,507.60) | 4.65 |
| 6/20/2016 | $ 50,000.00 | | ($12,100,183.10) | 4.60 |
| 7/1/2016 | $ 50,000.00 | | ($12,111,533.40) | 4.57 |
| 8/1/2016 | $ 50,000.00 | | ($12,235,390.65) | 4.48 |
| 8/8/2016 | $ 100,000.00 | | ($12,174,831.68) | 4.46 |
| 9/1/2016 | $ 50,000.00 | | ($12,259,916.29) | 4.40 |
| 9/19/2016 | $ 50,000.00 | | ($12,311,796.93) | 4.35 |
| 10/3/2016 | $ 50,000.00 | | ($12,341,299.53) | 4.31 |
| 10/17/2016 | $ 50,000.00 | | ($12,370,992.64) | 4.27 |
| 11/1/2016 | $ 50,000.00 | | ($12,406,603.25) | 4.23 |
| 11/16/2016 | $ 50,000.00 | | ($12,442,460.29) | 4.19 |
| 12/1/2016 | $ 50,000.00 | | ($12,478,565.48) | 4.14 |
| 12/15/2016 | $ 50,000.00 | | ($12,509,144.97) | 4.11 |
| 1/1/2017 | $ - | | ($12,607,299.03) | 4.06 |
| 1/15/2017 | $ - | | ($12,688,709.81) | 4.02 |
| 2/1/2017 | $ 100,000.00 | Jan | ($12,688,272.84) | 3.97 |
| 2/15/2017 | $ - | | ($12,770,206.50) | 3.93 |
| 3/1/2017 | $ - | | ($12,852,669.25) | 3.89 |
| 3/15/2017 | $ 100,000.00 | Feb | ($12,835,664.50) | 3.86 |
| 4/1/2017 | $ - | | ($12,936,380.61) | 3.81 |
| 4/15/2017 | $ - | | ($13,019,916.42) | 3.77 |
| 5/1/2017 | $ - | | ($13,116,046.64) | 3.73 |
| 5/15/2017 | $ - | | ($13,200,742.62) | 3.69 |
| 6/1/2017 | $ - | | ($13,304,323.36) | 3.64 |
| 6/15/2017 | $ - | | ($13,390,235.13) | 3.60 |
| 7/1/2017 | $ - | | ($13,489,099.52) | 3.56 |
| 7/18/2017 | $ 50,000.00 | Jul | ($13,544,942.88) | 3.51 |
| 8/1/2017 | $ 50,000.00 | Aug | ($13,582,408.43) | 3.47 |
| 8/17/2017 | $ - | | ($13,682,691.71) | 3.43 |
| 9/1/2017 | $ - | | ($13,777,379.63) | 3.38 |
| 9/15/2017 | $ - | | ($13,866,346.13) | 3.34 |
| 10/1/2017 | $ - | | ($13,968,725.81) | 3.30 |
| 10/15/2017 | $ - | | ($14,058,927.91) | 3.26 |
| 11/1/2017 | $ - | | ($14,169,242.47) | 3.21 |
| 11/15/2017 | $ - | | ($14,260,739.39) | 3.18 |
| 12/1/2017 | $ - | | ($14,366,031.00) | 3.13 |
| 12/15/2017 | $ - | | ($14,458,798.68) | 3.09 |
| 1/1/2018 | $ - | | ($14,572,250.86) | 3.04 |
| 1/15/2018 | $ - | | ($14,666,350.18) | 3.01 |
| 2/1/2018 | $ - | | ($14,781,430.93) | 2.96 |
| 2/15/2018 | $ - | | ($14,876,881.02) | 2.92 |

| Date | | Amount | | |
|---|---|---|---|---|
| 3/1/2018 | $ | - | ($14,972,947.48) | 2.88 |
| 3/15/2018 | $ | - | ($15,069,634.28) | 2.84 |